**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

United States of America,

        Plaintiff,

    v.

Thomas Ronald Hoover,

        Defendant.

Case No. 2:20-cr-00273-JCM-BNW

**REPORT AND RECOMMENDATION**

## I.    Introduction

Before the Court is Defendant, Mr. Hoover's, motion to suppress. ECF No. 54. The government opposed the motion (ECF No. 62), and Hoover replied (ECF No. 68). The Court held an evidentiary hearing on April 19, 2022 (ECF No. 71), after which the parties filed supplemental briefs. ECF Nos. 80, 81. Two issues are presented: (1) whether officers unlawfully prolonged a traffic stop and (2) assuming officers unlawfully prolonged the stop, whether they would have inevitably discovered the evidence in question (a gun).

The basic facts of the case are as follows: On the night in question, Las Vegas Metropolitan Police Department (LVMPD) officers stopped Ms. Hernandez for driving with a suspended registration. The Defendant, Hoover, was a passenger in the car. When police initially approached the car, they asked for both Hernandez and Hoover's licenses. Officers then asked Hernandez whether she had ever been arrested. When she admitted that she had and that she was on probation, officers asked her a series of questions about her probation, including whether she had any probation-conditions and whether she was in compliance with her probation.

Officers then returned to their patrol vehicle and ran Hernandez's records. They confirmed that the car's registration was suspended, and that Hernandez did not have a valid driver's license. Though they admittedly had all the information they needed to issue her a citation at this time, they did not begin this process.

1     Instead, they used Hoover's identification to run his criminal records. They discovered

2    that he also did not have a valid driver's license and that he had several prior convictions,

3    including two for being a felon in possession of a firearm. Based on Hoover's criminal history,

4    officers decided to remove Hernandez and Hoover from the car. They asked Hernandez for

5    consent to search the car for narcotics and firearms. She agreed. Police searched the car and

6    discovered methamphetamine and a gun.

7     Hernandez's car was subsequently towed that night. LVMPD policy allows vehicles to be

8    towed when a licensed driver is not present and the car is illegally parked, as was the case here.

9    This policy also requires that police inventory and document the property inside the car.

10    However, another LVMPD policy requires officers to consider appropriate alternatives (such as

11    release to a licensed driver) before towing is permissible. Officers did not comply with this policy

12    and consider alternatives before towing Hernandez's car.

13     Ultimately, Hoover was arrested and indicted for being a felon in possession of a firearm.

14    Hoover argues that his Fourth Amendment rights were violated because police impermissibly

15    prolonged the traffic stop. He argues that police prolonged the stop when they (1) asked

16    Hernandez probation-related questions, (2) ran Hoover's criminal records, and (3) asked for

17    consent to search the car and searched it. The government argues these actions were part of the

18    mission of the stop and did not impermissibly prolong it. The government also argues that even if

19    the stop was prolonged, police would have inevitably discovered the gun because the car would

20    have been towed and inventoried pursuant to LVMPD policy. Hoover disagrees that the gun

21    inevitably would have been discovered, because police did not comply with another LVMPD

22    policy that requires them to consider alternatives before towing a car. Hoover argues that had

23    officers considered alternatives, and not prolonged the stop, the gun may not have been

24    discovered.

25     The Court concludes that officers impermissibly prolonged the stop. The Court also

26    concludes that the government did not carry its burden to show that the gun would have

27    inevitably been discovered. Accordingly, the Court recommends that Hoover's motion to

28    suppress be granted.

1    In support of this recommendation, the Court provides its findings of facts, the parties'

2    arguments, and the relevant law, followed by its analysis.

3    **II.      Factual Findings**

4    The Court makes the following findings of fact based on the witnesses' testimony and

5    evidence admitted into the record.

6    On the March 8, 2020, LVMPD Officer Emry was patrolling in a marked police vehicle

7    with his partner, Officer Adkins. ECF No. 72 at 10 (Transcript of Evidentiary Hearing). While

8    driving, they observed a Mustang. *Id.* They conducted a record check of its license plate, which

9    revealed that the registration was suspended. *Id.* at 10-11. As a result, they decided to conduct a

10    traffic stop for the suspended registration. *Id.* at 11, 36-37, 38, 88 (no other traffic violations or

11    suspicious behaviors were observed).

12    The Mustang stopped in the far-right lane of Tropicana Avenue, where I-15 merges onto

13    Tropicana. *Id.* at 11, 71-72. Emry approached the driver's side, and Adkins approached the

14    passenger's side. *Id.* at 12; *see also* Government's Ex. 2 (Emry Bodycam).

15    Emry told the driver, Hernandez, that he stopped her because her plates were suspended.

16    Government's Ex. 2. Hernandez indicated that she knew her plates were suspended. *Id.* She

17    explained that she was having issues with her insurance company and could show Emry text

18    messages between her and her insurance company.[1] Government's Ex. 2.

19    Emry then asked if she had her driver's license. Government's Ex. 2. As Hernandez began

20    to get her identification, she said that she had her insurance and registration, too. *Id.* As she began

21    gathering her documents, and before she handed anything to Emry, Emry signaled to Adkins to

22    ask for the passenger's (Hoover's) identification. *Id.* at 1:09-1:11; ECF No. 72 at 15. Adkins

23    asked Hoover for his identification. ECF No. 72 at 72. After a few seconds, Hernandez handed

24    Emry her Nevada identification card and registration.[2] Government's Ex. 2 at 1:25-1:26; ECF No.

25    72 at 12, 15.

26

27    _____

[1] Emry testified that in his experience, when insurance lapses, the Nevada DMV automatically suspends a car's registration. ECF No. 72 at 18.

28    [2] A Nevada state identification card is for identification purposes only and does not confer driving privileges. *Id.* at 12-13.

Emry then asked Hernandez whether she had ever been arrested. Government's Ex. 2 at 1:30-1:31. She responded, "yes" and Emry asked, "for what?" *Id.* at 1:32-1:33. Hernandez responded that she was on probation for burglary. *Id.* at 1:33-1:37. As Hernandez explained this, it appears Adkins reached to take Hoover's identification and then asked Hoover if he had ever been arrested or cited in any state.[3] Government's Ex. 2 at 1:34-1:37; ECF No. 72 at 72-73. Hoover said he had been arrested in Nevada and had a few felonies. ECF No. 72 at 73. Emry continued asking Hernandez questions related to her arrest history and then probation:

Emry: "Anything violent? Guns? Anything like that? Narcotics charges? Anything?"

Hernandez: "No."

Emry: "Ok. Are you in good standing?"

Hernandez: "I'm in good standing. Everything is good. I just saw my PO two days ago. Friday."

Emry: "Okay. Do you have any conditions on your probation?"

Hernandez: "No."

Emry: "Curfew? No narcotics? Anything like that?"

Hernandez: "No."

Emry: "Okay. Where are you headed right now?"

Hernandez: "Drop him [Hoover] off at home and then to go pick up my daughter." Government's Ex. 2 at 1:37-2:00.

Emry testified on direct examination that he asked these questions for safety and identification purposes. ECF No. 72 at 13. He further explained that if someone lies about their criminal history, it shows that they may be hiding something. *Id.* And if they have a violent history, it may affect officers' decision to pull them out of the car right away. *Id.* On cross examination, Emry admitted that these questions were asked to determine whether Hernandez was in compliance with her probation and to gauge her honesty. *Id.* at 43. Based on the evidence,

---

[3] Adkins did not turn on his bodycam in time to capture the audio of the conversation he had with Hoover. Defense Ex. A at 0:00-0:35; ECF No. 72 at 76-77. Accordingly, to determine the sequence of events during officers' initial encounter with Hernandez and Hoover, the Court relies on what Emry's bodycam shows Adkins doing.

the Court finds that Emry asked these questions to determine whether Hernandez was in compliance with her probation and to gauge Hernandez's honesty. The Court finds that Emry believed that if Hernandez lied, she may also have been hiding something. Nevertheless, at this point in the stop, nothing had happened to raise any specific officer safety concerns. The car was stopped solely because its license plate was suspended. *Id.* at 10-11, 36-37, 38. And Emry testified that during his initial encounter with Hernandez, she complied with all requests, followed all instructions, answered all questions, was not evasive, did not appear to be under the influence of any drugs or alcohol, and there was no indication of any narcotics use or that criminal activity was afoot. *Id.* at 40-42, 44-45. Additionally, Adkins did not report any safety concerns to Emry after his initial encounter with Hoover.[4] ECF No. 72 at 44. Adkins testified that Hoover answered his questions, was not aggressive or loud, and did not have contraband, drugs, or weapons in his hands. *Id.* at 93-94.

After Emry finished asking Hernandez about her probation and where she was going, he told her that if she could find her insurance (which she said she had on her phone), she should stay in the car because there was a lot of traffic.[5] Government's Ex. 2 at 2:00-2:08; ECF No. 72 at 40. Emry and Adkins then walked back to their patrol vehicle. Government's Ex. 2 at 2:09-2:16; ECF No. 72 at 13.

Emry got into the patrol vehicle and ran Hernandez's records. ECF No. 72 at 17; Government's Ex. 2 at 2:20-2:58. Emry learned that Hernandez was not a licensed driver and confirmed she was on probation. ECF No. 72 at 17-18, 45. Emry also knew that her registration was suspended. *Id.* at 18. At this point, Emry had all the information he needed to write a citation

---

[4] Adkins later testified that when he first approached Hoover, Hoover appeared more nervous than is usual— "just the vibe I got from him, it just seemed a little more nervous than usual." ECF No. 72 at 113. The Court does not find this testimony credible, as Adkins did not articulate any facts that he observed which would support that "vibe." *See id.* Additionally, Adkins did not report that Hoover appeared unusually nervous to Emry when they returned to their patrol vehicle (even as they discussed Hoover's criminal history). *See* Defense Ex. A. In fact, Adkins only talked about Hoover's criminal history after Emry prompted him. *See* Government's Ex. 2 at 5:05-5:15. The arrest report also did not indicate that Adkins observed this allegedly nervous behavior. ECF No. 72 at 113. Accordingly, the Court does not credit Adkins' testimony that Hoover seemed unusually nervous when Adkins first spoke to him.
[5] Emry never re-asked Hernandez whether she found her insurance information. ECF No. 72 at 65.

1  but neither he nor Adkins began this process. ECF No. 72 at 46-47, 97; Government's Ex. 2 at

2  2:55-5:37.[6]

3      Instead, as Emry scrolled through Hernandez's records, Adkins said, "run him," meaning

4  that Emry should run Hoover's records. Government's Ex. 2 at 2:57-2:58; ECF No. 72 at 20, 96-

5  97; Defense Ex. A at 1:00-1:02. Emry then ran Hoover's records. Government's Ex. 2 at 3:30-

6  5:20; ECF No. 72 at 18-19. Emry testified that, by running Hoover's records, he hoped to learn

7  whether Hoover had a valid driver's license and he intended to also run his criminal history. ECF

8  No. 72 at 21, 47-48. The Court does not believe that Emry ran Hoover's records to determine if

9  he had a valid driver's license, as Emry signaled Adkins to get Hoover's identification *before*

10  Emry knew Hernandez did not have a valid driver's license. *See* Government's Ex. 2 at 1:09-

11  1:26. Further, Emry and Adkins did not discuss Hernandez's inability to drive or Hoover's

12  potential ability to drive. *See* Government's Ex. 2; ECF No. 72 at 49, 98. Additionally, neither

13  officer ever asked Hernandez whether she would allow Hoover to drive her car. ECF No. 72 at

14  49-50, 98. The officers did, however, talk at length with the occupants of the car (and each other)

15  about the occupants' criminal histories. *See* Government's Ex. 2. Accordingly, the Court finds

16  that officers did not run Hoover's records to determine if he had a valid driver's license but rather

17  to review his criminal records.

18      As Emry began reviewing Hoover's records, he asked, "Is this guy on federal probation?"

19  *Id.* at 4:16-4:18. Adkins responded that Hoover told Adkins he had a couple felonies. *Id.* at 4:21-

20  4:24. Emry responded that he thought the records he was looking at were Hoover's. *Id.* at 4:27-

21  4:28. Emry then appeared to read a notation off his computer system that instructed police to

22  contact federal probation within 24-hours if an inquiry or contact was made with Hoover. *Id.* at

23  4:32-4:39. Emry then told Adkins that Hoover lived at "that felon house on Sammy Davis." *Id.* at

24  4:51-4:55. As Emry continued to look at Hoover's records, he said, "he's got felon in possession

25  of firearm. All kinds of shit, dude. Convictions." *Id.* at 5:01-5:05. Emry then continued to scroll

26  through Hoover's records and asked Adkins if Hoover said he was arrested "or anything?" *Id.* at

27

28  ───────────

[6] Neither officer began the process of calling a tow truck at this point either. ECF No. 72 at 46-47; Government's Ex. 2 at 2:55-5:37.

5:05-5:12. Adkins responded that he had asked Hoover, and Hoover admitted he had been arrested. *Id.* at 5:13-5:15. Emry then briefly continued looking at Hoover's records.[7] *Id.* at 5:13-5:20.

Emry then stated to Adkins, "Let's check. We're gonna get 'em out. We're gonna check and make sure there is not a gun, dude." *Id.* at 5:20-5:23. Adkins responded, "Ya, there is no insurance on this right?" *Id.* at 5:23-5:25. Emry responded that Hernandez said she had insurance, but the plates were suspended. *Id.* at 5:25-5:29. Adkins responded, "Right, so we can…hold on, camera off." *Id.* at 5:29-5:34. Both officers then indicated that they were turning their cameras off to have a discussion with their partner. *Id.* at 5:32-5:37.[8]

After officers completed their private discussion, they asked both occupants to get out of the car.[9] Emry asked Hernandez to get out of the car, which she did. ECF No. 72 at 22. Adkins then asked Hoover to exit the car, which he did.[10] *Id.* Both occupants were taken to the front of the patrol vehicle. *Id.* at 22. Neither occupant was patted down or handcuffed at this point. *Id.* at 53-54, 106.

Emry testified that after the occupants were removed from the car, he asked Hernandez if there were any narcotics or firearms in the car.[11] *Id.* at 23. Emry testified that Hernandez told him "no." *Id.* at 23. Emry then asked for her consent to search the car for narcotics and firearms, and she gave her consent. *Id.* at 23, 55. While the audio of this conversation is not captured on

---

[7] Emry testified that while he ran Hoover's records, he also learned that Hoover's driver's license was suspended. ECF No. 72 at 19. Neither Emry nor Adkins' bodycam captures any comment or discussion about this, however. *See* Government's Ex. 2; Defense Ex. A.

[8] Adkins admitted that, under LVMPD policy, it was not permissible to turn off his bodycam at this point. ECF No. 72 at 100-101, 103. The Court finds that this behavior obstructs the purpose for which bodycams were instituted—transparency.

[9] Still, neither officer had begun writing a traffic citation. ECF No. 72 at 53.

[10] Hoover had a Pit Bull with him that Adkins had Hoover take with him when he exited the car. ECF No. 72 at 54, 78. The Pit Bull was wearing a service-animal jacket and the officers wanted the dog to be with the person who knew it, Hoover. *Id.* at 55, 78. Accordingly, as Hoover stood at the front of the police vehicle, he had his dog with him on a leash. *See id.* at 105.

[11] Nothing about the stop (or Hernandez or Hoover's records) suggested there may be drugs in the car. *Id.* at 41-42, 53, 55.

bodycam (*id.* at 23), the Court finds that this conversation occurred, and that Hernandez gave her consent.[12]

Emry then began his search of the car. ECF No. 72 at 23. Emry can be heard on his bodycam stating, "Going to do a consensual search of the vehicle. The passenger is a convicted felon for firearms charges. Doing a quick check of the vehicle for narcotics and firearms." Government's Ex. 4 at 0:30-0:39; ECF No. 72 at 55-56.

Emry began searching in the driver's area and discovered a small pouch under the driver's seat. Government's Ex. 4 at 0:40-1:33. The pouch was too small to carry a firearm, and Emry was specifically looking for drugs in it; he was not concerned that it contained a weapon. ECF No. 72 at 56-57. Inside the pouch, Emry found what he believed to be "crystal meth." Government's Ex. 4 at 0:40-1:33; ECF No. 72 at 24. Once he found this, he walked back to where Hernandez and Hoover were standing with Adkins and asked whose methamphetamine was in the car. Government's Ex. 4 at 1:33-1:55. Neither occupant said that the meth was theirs.[13] Government's Ex. 4 at 1:33-1:55; ECF No. 72 at 26. Emry then returned to the car to continue searching it. Government's Ex. 4 at 1:55-2:00. At this point, Adkins put Hoover in handcuffs, patted him down, and searched his pockets. Government's Ex. 3 at 5:18-9:07. Adkins did not find any weapons or contraband on Hoover. ECF No. 72 at 111.

Emry continued searching in the driver's area, behind the driver's seat, and then in the passenger's seat. Government's Ex. 4 at 2:00-6:03. While searching the passenger's seat, Emry found a gun holster. *Id.* at 6:03-6:39; ECF No. 72 at 28. Emry then notified Adkins that there was a holster in the car. Government's Ex. 4 at 6:14-6:16; ECF No. 72 at 28. Emry retrieved the holster and put it in his patrol vehicle. Government's Ex. 4 at 6:25-6:52; ECF No. 72 at 28. Emry then returned to the car and continued his search. Government's Ex. 4 at 6:52-7:59. After

---

[12] After Emry completed his search, he talked to Hernandez about the contraband he found in the car. Government's Ex. 4 at 8:44-9:30. Hernandez indicated that she would not have agreed to let officers search her car had she known there was contraband in it. *Id.*; ECF No. 72 at 34. This conversation substantiates Emry's testimony that he received Hernandez's consent to search her car.

[13] At this point, Adkins indicated to Emry that they should Mirandize Hernandez and Hoover. *Id.* at 1:47-1:54; ECF No. 72 at 79-80. Adkins Mirandized them shortly thereafter. Government's Ex. 3 at 3:49-4:15; ECF No. 72 at 108.

1    searching for a bit, Emry discovered a firearm under the passenger's seat. *See Id.* at 7:58-8:17;

2    ECF No. 72 at 28, 30.

3        After finding the gun, officers froze the car. ECF No. 72 at 30, 83. They obtained a search

4    warrant that night and seized the firearm that is the subject of the indictment in this case. *See id.*

5    at 30-31, 83. Hoover was arrested that night.[14] *Id.* at 31.

6        Hernandez's car was also towed that night. *Id.* at 31, 84. The car was towed pursuant to

7    LVMPD policy that allows cars to be towed when there is not a licensed driver present, and the

8    car is illegally parked. *Id.* at 31-32, 84; Government's Ex. 6 at 668.

9        Emry testified that even if officers had not found drugs or the gun in the car that night,

10   they would not have allowed the car to be driven away. ECF No. 72 at 31. Adkins testified

11   similarly that if no one had been arrested that night, the car still would have been towed. *Id.* at 84.

12   This is so because, under LVMPD policy, cars can be towed when there is no licensed driver

13   present and the car is illegally parked. *Id.* at 31-32, 84; *see also* Government's Ex. 6 at 668, ¶ 12

14   ("Vehicles may only be impounded in the following circumstances . . . If there is not a licensed

15   driver in the vehicle and it is not legally parked."). Under the same policy, when a car is towed,

16   officers are required to conduct an inventory and document all personal property. ECF No. 72 at

17   32; Government's Ex. 6 at 668 ("Impounding officers must thoroughly search vehicles and

18   containers located therein per LVMPD 5/200.00, *Searches – Section 5*. Personal property must be

19   inventoried on the Vehicle Impound Report.").

20       LVMPD also has a policy that requires other options besides towing to be considered

21   when a driver cannot drive their car away. Specifically, the policy states, "Officers will NOT

22   permit drivers with suspended or revoked privileges to drive away in their vehicle. Alternatives

23   such as release to a licensed driver or other appropriate action will be considered before towing a

24   vehicle." Defense Ex. C at 342.

25

26

27   ───────────────────
     [14] There was conflicting testimony about whether Hernandez was arrested that night. *Id.* at 31, 83-84.
28   However, the Court need not make a factual finding regarding whether Hernandez was arrested for
     purposes of resolving this motion.

As the Court will explain, it finds that it is more likely than not that officers did not follow this policy. There is a lack of factual support for the proposition that officers considered releasing the car to a licensed driver or another appropriate alternative before towing Hernandez's car.

First, there is little in the record to suggest that officers actually considered alternatives to towing Hernandez's car. The best evidence supporting the notion that officers considered alternatives to towing came at the end of Emry's testimony—on recross. Emry was asked directly if he considered other options before towing. ECF No. 72 at 64. He stated, "We're allowed discretion in the policy[,] and I would say that we considered it and we decided against it." *Id.* The Court followed up on this non-specific response and asked, "You said that you considered other alternatives. What did you specifically consider?" *Id.* at 66. Emry responded, "We would always consider seeking to call somebody to come and collect the vehicle."[15] ECF No. 72 at 66. The Court finds that this is a general and hypothetical answer about what officers "would" normally do; however, it is insufficient to show that on this specific occasion, police actually considered other alternatives. This conclusion is reinforced by the fact that both officers unequivocally admitted that they did *not* seek to call anyone to collect the car in this case. *Id.* at 64, 66, 99.

Emry also testified that if a licensed driver had been present at the scene, he would have considered allowing that person to move the car. *Id.* at 62. In other words, Emry testified that, *had the situation been different*, he *would have* considered an alternative to towing. This testimony is also hypothetical and insufficient to convince the Court that in this case, officers considered alternatives before towing Hernandez's car. Instead, if anything, this testimony supports the conclusion that officers did not consider alternatives to towing (but would have done so had a licensed driver been present).[16]

---

[15] Emry also testified that it was late at night. *Id.* This testimony is irrelevant because LVMPD policy does not contain any exceptions based on the time of day. *See* Defense Ex. C at 342.

[16] Additionally, Emry appeared to believe that the policy afforded him wider discretion than it does, undermining the proposition that he considered other alternatives. On redirect, Emry testified that there is no requirement that officers do something different (presumably other than towing the car) and that it is their "discretion." *Id.* at 62. However, LVMPD policy provides that "[a]lternatives such as release to a licensed driver or other appropriate action *will be considered* before towing a vehicle." Defense Ex. C at 342 (emphasis added). The Court interprets this policy as requiring officers to consider other appropriate

1    Second, the rest of the record undermines the notion that officers considered any

2    alternative. For example, both officers admitted they never asked Hernandez for a name (or

3    number) so that someone could get the car. ECF No. 72 at 66, 99. Indeed, Emry admitted he

4    never spoke to Hernandez at all about potential alternatives to towing. *Id.* at 64. Further, Emry

5    admitted that he did not seek out alternatives before deciding to tow the car. *Id.* at 58-59 (neither

6    before nor after officers discovered the contraband in the car did they seek out alternatives to

7    towing). Adkins also failed to offer testimony that he considered alternatives to towing. *See* ECF

8    No. 72. Additionally, none of the bodycam footage from the night in question shows officers

9    commenting about or discussing alternatives to towing the car. *See* Def. Ex. A, Government's

10    Exs. 2-4. Nor was there any testimony that the officers consulted with one another about potential

11    alternatives to towing. *See* ECF No. 72. Accordingly, there is a lack of proof that officers

12    considered any alternative before towing Hernandez's car.[17]

13    **III.    The Parties' Arguments**

14          **A.    Hoover's Opening Brief**

15    Hoover argues that he was unlawfully seized during the traffic stop. ECF No. 54 at 13.

16    Specifically, he argues that officers prolonged the stop in violation of the Fourth Amendment by

17    (1) inquiring into the driver's potential probation violations, (2) reviewing Hoover's criminal

18    records, and (3) seeking consent to search the car and conducting the search. *Id.* at 1-2, 8-13.

19    Hoover argues that these three activities were unrelated to the mission of the traffic stop and not

20    otherwise justified by safety concerns or independent reasonable suspicion. *Id.* at 8-13.

21    Accordingly, Hoover argues that he was subject to an unlawful seizure. During this unlawful

22    seizure, the gun was discovered, and he made certain statements. *Id.* at 2. He argues both must

23    be suppressed as the fruit of the poisonous tree. *Id.* at 2, 14.

24    _____

25    options before towing; the Court does not interpret the policy as affording officers discretion to *not* consider other options. Emry's testimony to the contrary suggests to the Court that Emry may have incorrectly believed he was not required to consider alternatives before towing.

26    [17] To the extent it could be argued that the alternative officers considered was whether Hoover could drive, the Court rejects this notion. As the Court already explained in detail, it does not believe that Emry ran

27    Hoover's records to determine if he had a valid driver's license. Additionally, and tellingly, neither Emry nor Adkins testified that Hoover was an alternative they considered when asked what alternatives they

28    considered. *See* ECF No. 72 at 66.

**B.      The Government's Response and Supplemental Brief**

The government argues that the stop was not prolonged and that even if it was, the inevitable discovery doctrine applies. ECF No. 62. Accordingly, the evidence should not be suppressed. *Id.*

**i.      Prolongation**

First, the government argues that the probation-related questions Emry asked the driver were related to the mission of the stop, as they were asked to ensure officer safety and provide some confirmation of the driver's identity. *Id.* at 5-6. Accordingly, these questions did not impermissibly prolong the stop.

Second, the government argues that running Hoover's records did not impermissibly prolong the stop. *See id.* at 7, 9. The government's theory is that officers ran Hoover's records to determine if he had a valid driver's license and could drive the car once the stop was complete. *Id.* The government also argues that a recent Ninth Circuit decision (*United States v. Hylton*, 30 F.4th 842 (9th Cir. 2022)) moots Hoover's argument that the traffic stop was prolonged. ECF No. 80 at 2. The government contends that in *Hylton*, the Ninth Circuit held that running a criminal records check stems from the mission of the traffic stop and that it is a trivially burdensome precaution necessary to safely conduct the stop. *Id.* at 2. The government acknowledges that *Hylton* dealt with running a *driver's* criminal records but argues that the safety concerns that justify running the driver's records apply equally to running *passengers'* records. *Id.* at 2, n.1. Accordingly, the government argues that *Hylton* authorizes officers to run drivers and passengers' criminal backgrounds without impermissibly prolonging the stop. *See id.* at 2-4.[18]

In a similar vein, the government argues that it was permissible for officers to ask Hoover for his identification when they first approached the car. *Id.* at 4-5. In making this argument, the government attempts to distinguish *United States v. Landeros*, 913 F.3d 862 (9th Cir. 2019) (in which the court held that *demanding* a passenger's identification impermissibly prolonged a stop) and cites to *United States v. Diaz-Castaneda*, 494 F.3d 1146 (9th Cir. 2007) (in which the court

---

[18] The government also argues that the probation-related questions Emry asked the driver were safety-related and thus acceptable under *Hylton*. *See id.* at 3-4.

1    held that *asking* a passenger for his identification was permissible). According to the government,

2    *asking* for Hoover's identification did not impermissibly prolong the stop. ECF No. 80 at 4-5.

3    And because the driver did not have a valid driver's license, officers had to run Hoover's records

4    at some point to determine if he could drive. *Id.* at 5.

5        Third, the government does not appear to address whether requesting consent to search the

6    car or searching it prolonged the stop; the government simply notes that officers asked for and

7    obtained consent to search the car. *See* ECF No. 62 at 7-9.[19] And because officers found the gun

8    pursuant to a valid consent-search, the gun should not be suppressed. *See id.* at 9.

9                    **ii.    Inevitable Discovery**

10       The government also argues that even if the stop was impermissibly prolonged, the gun

11   should not be suppressed under the inevitable discovery exception to the exclusionary rule. *Id.*

12   The government's argument is as follows: before the gun was found, officers knew that the car's

13   registration was suspended, the driver had no insurance, and neither occupant had a driver's

14   license. *Id.* at 10. As such, neither occupant could drive the car away. *Id.* LVMPD's towing

15   policy allows cars to be towed in situations such as this (when there is not a licensed driver in the

16   car and it is not legally parked). *Id.* As such, the car would have been towed under LVMPD's

17   policy. *Id.* Under the same policy, it also would have been subject to an inventory search. *Id.*

18   During this search, the gun inevitably would have been discovered, and Hoover would have been

19   arrested all the same. *Id.*; *see also* ECF No. 80 at 5-7. Accordingly, the government requests that

20   the Court deny Hoover's motion to suppress.

21           **C.    Hoover's Reply and Supplemental Briefs**

22        Hoover makes several arguments in his reply and supplemental briefs.

23                **i.    Prolongation**

24       First, regarding Emry's probation-related questions, Hoover argues that there is nothing in

25   the record to suggest that these questions were asked for officer safety. ECF No. 68 at 2. When

26   these questions were asked, according to Hoover, nothing had occurred to raise any safety

27   _____

28   [19] The government also argues that once officers discovered the methamphetamine in the car, they had probable cause to search the car pursuant to the automobile exception. *Id.* at 8.

concerns. *Id.* While Hoover recognizes that all traffic stops have the potential to be dangerous for officers, he argues that the Ninth Circuit warns against taking safety precautions to facilitate investigations into other crimes. *Id.* at 2-3. Hoover argues that probing into whether a person is on probation and/or has supervision conditions is aimed at just that—investigating other potential crimes. *Id.* at 3. Accordingly, Hoover concludes that Emry impermissibly prolonged the stop by asking the driver about her probation status and conditions. *Id.*; *see also* ECF No. 81 at 17-18 (arguing that probation-related questions were not related to the mission of the stop but rather aimed at detecting ordinary criminal wrongdoing).

Second, Hoover argues that reviewing his criminal record did not further the mission of the traffic stop. ECF No. 68 at 3-5. Hoover argues that the government's explanation for why officers ran his criminal records (to see if he had a license and could drive the car away) is false. *Id.* at 4-5. According to Hoover, the evidence shows that officers were not reviewing his records to determine if he had a valid license but rather to review his criminal records. *Id.* Hoover also notes that under LVMPD policy, officers could only have released the car to Hoover (assuming he had a license) if the driver agreed to this. *Id.* at 5. But officers never asked Hernandez if she would allow Hoover to take the car, let alone before they reviewed his records. *Id.* Thus, Hoover concludes that officers were not reviewing his records to determine if he had a license but rather to review his criminal history. And the time officers spent doing this impermissibly prolonged the stop. *Id.*

Hoover also addresses the government's argument that the Ninth Circuit's decision in *Hylton*, 30 F.4th 842, allows officers to run a passenger's criminal records. ECF No. 81 at 12-13. In short, Hoover argues that *Hylton* only held that running a *driver's* criminal records during a traffic stop is permissible to complete the stop safely. *Id.* at 12. Hoover argues that *Hylton* did not establish a bright-line rule that officers may run the criminal histories of all passengers. *Id.* Such an interpretation of *Hylton*, according to Hoover, would be an overbroad reading of the Ninth Circuit's holding and contrary to United States Supreme Court precedent. *Id.*

Hoover argues that to determine whether running a passenger's criminal history during a traffic stop is permissible, this Court must determine whether running these records is part of the

1   mission of the stop. *Id.* at 12-13. Hoover argues that the mission of a traffic stop includes (1)

2   determining whether to issue a traffic citation, (2) ensuring highway safety, and (3) ensuring

3   officer safety. *Id.* at 13.

4         Hoover argues that running his criminal records was not necessary for any of these

5   purposes. First, police did not need to run his criminal records to determine whether to issue a

6   traffic citation, as the driver was stopped for a suspended registration. *Id.* Second, police did not

7   need to run Hoover's records to ensure highway safety, as he was not driving. *Id.* at 14. Hoover

8   notes again that, to the extent the government argues that officers ran his records to determine if

9   he was licensed and could drive the car away, the evidence does not support this explanation. *Id.*

10  at 14-15. Third, police did not need to run Hoover's criminal records to ensure officer safety. *Id.*

11  at 15-16. Hoover argues that nothing happened before officers ran his criminal records to trigger

12  any officer safety concerns. *Id.* Accordingly, Hoover argues that running his records was not part

13  of the mission of the stop and, therefore, impermissibly prolonged it. *Id.* at 16.

14        Hoover also argues that the Ninth Circuit's decision in *United States v. Landeros*, 913

15  F.3d 862 (9th Cir. 2019) supports his conclusion that officers impermissibly prolonged the stop

16  by running his criminal records. *Id.* at 18-19. Hoover argues that in *Landeros*, the Ninth Circuit

17  held that demanding a passenger's identity is permissible only if it is part of the mission of the

18  traffic stop (or supported by independent reasonable suspicion). *Id.* at 18. And demanding a

19  passenger's identity is not normally part of the mission of the traffic stop because it will

20  ordinarily have no relationship to the driver's safe operation of the car. *Id.* Here, Hoover argues

21  that obtaining his identification and running his criminal records was not related to the mission of

22  the stop (and officers did not have independent reasonable suspicion to investigate him), and thus,

23  the stop was impermissibly prolonged. *Id.* at 19.

24        Third, Hoover argues that officers prolonged the stop when they sought consent to search

25  the car and searched it. ECF No. 68 at 5. Hoover argues that these actions did not further the

26  mission of the traffic stop and were not supported by independent reasonable suspicion. *Id.* While

27  the government focuses on the fact that the driver consented to the search, Hoover argues that her

28  consent is irrelevant to the prolongation analysis; asking to search the car and searching it

impermissibly prolonged the stop because officers had no legally justifiable reason to ask to search. *Id.* at 5-7. Hoover notes that Emry specifically asked for consent to search for "narcotics and weapons," despite there being no reason to believe that drugs were in the car. *Id.* at 6. Neither occupant exhibited signs of drug use, and neither had any criminal history of drug use. *Id.* Similarly, Hoover argues that officers had no reason to believe that there were weapons in the car or that either the driver or Hoover was armed and dangerous. *Id.* According to Hoover, the only suggestion of danger the government identifies is Hoover's criminal history. *Id.* But, Hoover argues, this alone cannot establish reasonable suspicion or probable cause. *Id.* at 6-7. As such, Hoover argues that officers had no legally justifiable reason to ask to search the car. *Id.* at 7. And this request to search (as well as the search itself) unlawfully prolonged the stop. *Id.* According to Hoover, asking to search the car and searching it were actions aimed at discovering ordinary criminal wrongdoing. *See* ECF No. 81 at 19-20.

### ii.    Inevitable Discovery

Hoover argues that the government has not met its burden to show that the gun would have been found under the inevitable discovery doctrine. ECF No. 81 at 20-23. Hoover argues that the inevitable discovery doctrine will prevent suppression if the government can show that the evidence would have been discovered, absent the illegality, by following standard police procedures. *See id.* at 20-21. Here, Hoover argues that finding the gun was not inevitable. *Id.* at 20-23. According to Hoover, LVMPD has a policy that mandates that before a car is towed, officers *must* consider release of the car to a licensed driver or other appropriate alternatives. *Id.* at 21. Hoover argues that officers did not follow LVMPD policy in this case, because they did not consider alternatives to towing the car. *Id.* at 21-22. Had officers followed the policy, the gun may not have been discovered. Accordingly, Hoover argues that his motion to suppress should be granted.

Hoover also argues that officers only discovered that Hoover was a felon (and thus not permitted to possess firearms) by unlawfully reviewing his criminal records during the prolongation of the stop. ECF No. 68 at 7. Had officers not reviewed his criminal records and found the gun during an inventory search before towing the car, they would not have tied the gun

1    to Hoover. *Id.* Rather, it would simply have been inventoried as part of Hernandez's property. [20]

2    *Id.* Accordingly, Hoover argues that the gun would not have been inevitably discovered, and his

3    motion to suppress should be granted.

4    **IV.    Analysis**

5         The Fourth Amendment of the United States Constitution protects "[t]he right of the

6    people to be secure in their persons, houses, papers, and effects[] against unreasonable searches

7    and seizures . . . ." U.S. Const. Amend. IV.

8         This motion to suppress implicates two doctrines: one concerning when officers can

9    prolong a traffic stop and the other inevitable discovery. The Court will address each in turn.

10        **A.    Prolongation**

11        A traffic stop is a seizure that justifies an investigation into the observed traffic violation.

12   *Rodriguez v. United States*, 575 U.S. 348, 354 (2015); *United States v. Hylton*, 30 F.4th 842, 847

13   (9th Cir. 2022). "A routine traffic stop is more analogous to a *Terry* stop than to a formal arrest,

14   and it can become unlawful if it is prolonged" beyond the time necessary to complete the

15   "mission" of the stop. *Hylton*, 30 F.4th at 847 (cleaned up).

16              **i.    The Mission of a Traffic Stop**

17        A traffic stop's mission includes addressing (1) the traffic violation and (2) officer safety

18   concerns. *Rodriguez*, 575 U.S. at 354; *United States v. Evans*, 786 F.3d 779, 785 (9th Cir. 2015).

19        While addressing a traffic violation, an officer may determine whether to write a ticket

20   and engage in certain ordinary inquiries. *Rodriguez*, 575 U.S. at 355. Such inquiries include

21   "checking the driver's license, determining whether there are outstanding warrants against the

22   driver, and inspecting the automobile's registration and proof of insurance." *Id.* These inquiries

23   are permitted because they "serve the same objective as enforcement of the traffic code: ensuring

24   that vehicles on the road are operated safely and responsibly." *Id.* In other words, to address the

25   first part of the mission of the stop (the traffic violation), officers may decide whether to write a

26

27   ───────────────────────

28   [20] Because the Court finds that LVMPD would not have inevitably towed the car and found the gun, the
     Court need not reach this argument.

ticket and engage in certain ordinary inquiries to ensure the vehicle is being operated safely and responsibly.

Officers may also attend to safety concerns. Because traffic stops can be dangerous to police, officers "may need to take certain negligibly burdensome precautions" to complete the stop safely. *Id.* at 356; *Hylton*, 30 F.4th at 847.

### ii. Investigations Outside the Mission of a Traffic Stop

Investigations into other crimes, besides the traffic violation that prompted the stop, are outside of a traffic stop's mission. *Rodriguez*, 575 U.S. at 356. Safety precautions taken to facilitate detours into such investigations are also outside the mission of the stop. *Id.*

Investigations or inquiries into matters outside the mission of the stop, however, do not automatically convert an otherwise lawful stop into an unlawful stop. *Id.* at 355. Such investigations are permissible if they (1) do not add time to the stop or (2) are supported by reasonable suspicion. *Id.* (an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual"); *Evans*, 786 F.3d at 785-86 ("Tasks not related to the traffic mission . . . are therefore unlawful if they add time to the stop, and are not otherwise supported by independent reasonable suspicion of wrongdoing.") (cleaned up).

Accordingly, a traffic stop is not unlawfully prolonged if actions taken during the stop are part of the mission of the stop, do not add time to the stop, or are supported by independent reasonable suspicion.

### iii. The Traffic Stop in This Case

Hoover argues that officers prolonged the stop in violation of the Fourth Amendment by (1) inquiring into the driver's potential probation violations, (2) reviewing Hoover's criminal records, and (3) seeking consent to search the car and conducting the search. ECF No. 54 at 1-2, 8-13.

### a.    Emry's Probation-Related Questions Prolonged the Stop

The Court finds that Emry's probation-related questions impermissibly prolonged the traffic stop.

First, the Court finds that Emry's probation-related questions were outside the mission of the stop. There does not appear to be any controlling United States Supreme Court or Ninth Circuit authority regarding whether asking a driver about her probation conditions is part of the mission of a traffic stop. However, an unpublished Ninth Circuit decision suggests that if the Ninth Circuit were to take up this question in a published opinion, it would hold that such questions are outside the mission of a traffic stop and thus must be supported by reasonable suspicion if they prolong the stop. In *United States v. Hoffman*, the Court found that an officer prolonged a traffic stop to request the probation statuses of both the driver and his passenger (but that it was justified in that case by reasonable suspicion). 762 F. App'x 397, 399 (9th Cir. 2019) (reasonable suspicion justified "prolongation to request the criminal histories and probation statuses of both Hoffman and his passenger").

Several district courts in the Ninth Circuit have similarly held that probation-related questions are outside the mission of a traffic stop. *See, e.g.*, *United States v. Lewis*, No. 220CR00197RFBBRW, 2022 WL 834804, at *3 (D. Nev. Mar. 21, 2022) (officer "unlawfully prolonged the traffic stop by pursuing an investigation into whether or not Lewis was in violation of his parole conditions . . . there is nothing about the investigation into the conditions of Lewis' parole or any purported violation that was in any way related to the traffic stop in this case."); *United States v. Odom*, No. 21-CR-00259-JST-1, 2022 WL 611206, at *3 (N.D. Cal. Mar. 2, 2022) ("[Q]uestions relating to probation and parole are wholly unrelated to an officer's mission of ensuring that vehicles on the road are operated safely and responsibly.") (cleaned up); *United States v. Mati*, 466 F. Supp. 3d 1046, 1056 (N.D. Cal. 2020) ("[A]sking a driver about his probation status—and particularly whether he has a search condition—is not aimed at ensuring that vehicles on the road are operated safely and responsibly. Asking whether a driver is on probation and has a search condition is, instead, intended to uncover evidence of criminal activity."); *United States v. Ward*, No. 16-CR-00485-JST-1, 2017 WL 1549474, at *3 (N.D. Cal.

May 1, 2017) ("[W]hether Ward was on probation or parole is wholly unrelated to Meads'

mission of ensuring that vehicles on the road are operated safely and responsibly.") (cleaned up).

The Court is persuaded by all these cases that inquiring into a driver's probation status and

conditions is not generally related to the mission of a routine traffic stop. And, as explained

below, inquiring into Hernandez's conditions was not related to the mission of officers' stop in

this specific case, even considering officer safety.

The Court already found that Emry asked his probation-related questions to determine

whether Hernandez was in compliance with her probation and to gauge Hernandez's honesty.

Neither of these goals had anything to do with ensuring Hernandez's car was operated safely and

responsibly. Nor were Emry's questions relevant to officer safety. Emry testified that if someone

lies about their criminal history, it shows that they may be hiding something. ECF No. 72 at 13.

So, if Hernandez lied about her criminal history, according to Emry, she might have been hiding

something. As an initial matter, it is unclear whether Emry would have been able to confirm

whether Hernandez gave truthful answers about her probation conditions; no testimony was

offered on this point. Even assuming, however, that Emry could determine if Hernandez was

lying about her probation conditions, this would not inform her level of dangerous (and therefore

would not make officers any safer).[21] Instead, these questions were geared at detecting other

wrongdoing. *See Mati*, 466 F. Supp. 3d at 1056 (questions related to probation conditions are

"intended to uncover evidence of criminal activity."). These questions are exactly the type of

"safety precaution" taken to facilitate a detour into an investigation outside the mission of the stop

(i.e., whether Hernandez was in compliance with her probation or what she may have been

hiding) that the United States Supreme Court explicitly held is not permissible. *Rodriguez*, 575

U.S. at 356 ("On-scene investigation into other crimes, however, detours from [the] mission. So

too do safety precautions taken in order to facilitate such detours.") (cleaned up). Moreover,

---

[21] Understanding whether Hernandez was a felon (or had a criminal history) was what was important for officer safety, not whether she was in compliance with all her probation conditions. *See Hylton*, 30 F.4th at 847-48 ("Whether a felon is properly registered is less related to officer safety than whether someone is a felon at all. That's why a felon registration check is 'a measure aimed at detecting evidence of ordinary criminal wrongdoing,' but a criminal history check is supported by an 'officer safety justification.'").

1    rather than making officers safer, the Ninth Circuit has twice explained that "spending more time

2    with a driver to ask him unnecessary questions actually has an inverse relationship to safety."

3    *Mati*, 466 F. Supp. 3d at 1057 (*citing Evans*, 786 F.3d at 787 and *Landeros*, 913 F.3d at 868).

4    Accordingly, the Court finds that Emry's probation-related questions were outside the mission of

5    the stop, even considering officer safety.

6        The Court's conclusion is not changed by the government's argument that *Hylton* allows

7    officers to inquire into a driver's criminal history for their safety. *See* ECF No. 80 at 2-3. In

8    *Hylton*, the Ninth Circuit held that running a driver's criminal history is part of the mission of the

9    stop necessary to ensure officer safety. 30 F.4th at 848. Here, however, it is not disputed that

10   officers could run Hernandez's criminal history. Rather, what is disputed is whether officers

11   could inquire into what conditions Hernandez had on her probation and whether she was in

12   compliance with these conditions. This Court found that officers could not, and *Hylton* supports

13   this conclusion. In *Hylton*, the Ninth Circuit distinguished *Evans*, 786 F.3d 779 (which prohibited

14   felon-registration checks), explaining that knowing whether the driver is a felon is necessary to

15   complete the stop safely, while knowing whether the driver is properly registered as a felon is

16   related to detecting ordinary criminal wrongdoing. *Hylton*, 30 F.4th at 847-48. So too here, the

17   Court finds that knowing whether Hernandez had probation conditions and was in compliance

18   with them was related to detecting ordinary criminal wrongdoing, not officer safety.

19       Second, the Court finds that Emry's probation-related questions added time to the stop,

20   approximately 14 seconds. Government's Ex. 2 at 1:41-1:55. While this a short time, the Supreme

21   Court rejected the proposition that officers may engage in activities outside the mission of the

22   stop so long as they are short or *de minimis*. *Rodriguez*, 575 U.S. at 353-57; *United States v.*

23   *McCowan*, 547 F. Supp. 3d 966, 975 (D. Nev. 2021) (explaining that "*Rodriguez* specifically

24   rejected a *de minimis* exception when reversing the lower courts' ruling that 'the extension' of the

25   stop was 'permissible because of its brevity'" and finding 40-seconds of questioning outside the

26   mission of the stop made the seizure unlawful).

27       Third, the Court finds that officers did not have independent reasonable suspicion to

28   inquire into Hernandez's probation status, nor does the government argue this.

1    Accordingly, officers unlawfully prolonged the stop when Emry asked Hernandez

2    questions about her probation.

3           **b.**    **Running Hoover's Criminal Records Prolonged the Stop[22]**

4    The Court finds that running Hoover's criminal records impermissibly prolonged the stop.

5    First, running Hoover's criminal records was outside the mission of the stop. There does

6    not appear to be any controlling United States Supreme Court or Ninth Circuit authority directly

7    stating whether running a passenger's criminal records is within the mission of a stop. However,

8    as the Court will explain, *United States v. Landeros*, 913 F.3d 862 (9th Cir. 2019) indirectly

9    answers this question. In *Landeros*, the court explained that "[a] demand for a passenger's

10   identification is not part of the mission of a traffic stop." *Id.* at 868. This is so because the identity

11   of a passenger, "will ordinarily have no relation to a driver's safe operation of a vehicle." *Id.* And

12   knowing the passenger's identity will not make officers any safer. *Id.* Instead, extending the stop

13   and prolonging officers' exposure to the passenger is "inversely related to officer safety." *Id.*

14   Accordingly, officers may not demand the passenger's identification in a way that prolongs the

15   stop without independent reasonable suspicion. *See id.*

16   It follows from *Landeros* that if *demanding* a passenger's identification is not part of the

17   mission of a traffic stop, *requesting* a passenger's identification is not part of the mission of the

18   stop either.[23] The Ninth Circuit reasoned that a demand for a passenger's identity is not part of the

19   mission of the stop because (1) it usually has "no relation to a driver's safe operation of a vehicle"

20   and (2) knowing the passenger's identity will not make officers any safer. *Landeros*, 913 F.3d at

21   868. This logic applies equally whether police are demanding or requesting a passenger's

22   identification. *See also McCowan*, 547 F. Supp. 3d at 970-75 (requesting passengers' identities

23   was outside stop's mission, prolonged the stop, and made seizure unlawful).

24

25   [22] Hoover did not argue that requesting Hoover's identification prolonged the stop, so the Court need not
     reach this issue.

26   [23] *Landeros* noted that a prior Ninth Circuit case (which the government cites here), *United States v. Diaz-
     Castaneda*, 494 F.3d 1146, 1152 (9th Cir. 2007) permitted officers to ask passengers for their

27   identification. *Landeros*, 913 F.3d at 870. However, in *Landeros*, the Ninth Circuit indicated that this
     precedent may be invalid after *Rodriguez* (but it did not need to decide the question). *Landeros*, 913 F.3d

28   at 870.

If requesting or demanding a passenger's identification is not within the mission of the stop, neither is running the passenger's criminal history. The latter generally cannot occur without the former. And it would make little sense for the Court to hold that running a passenger's criminal history *is* part of the mission of the stop only in limited circumstances (e.g., where requesting a passenger's identity did not prolong the stop or officers already knew the passenger's identity). If running a passenger's criminal history was truly necessary to ensure officer safety during stops, then officers should be able to *demand* passengers' identities in all cases to run their criminal histories. The Ninth Circuit, however, has decided that demanding a passenger's identity is not part of the mission of the stop. *Id.* at 868. Accordingly, the Court believes that were the Ninth Circuit to take up the issue, it would hold that running a passenger's criminal history is not part of the mission of the stop. *See United States v. Hoffman*, 762 F. App'x 397, 399 (9th Cir. 2019) (stop prolonged to request criminal history of passenger but justified by reasonable suspicion); *United States v. Maffei*, 417 F. Supp. 3d 1212, 1217, 1221-23 (N.D. Cal. 2019), *aff'd,* 827 F. App'x 760 (9th Cir. 2020) (officer unreasonably prolonged traffic stop by conducting records check of the passenger).

The Court acknowledges that there is an apparent tension between *Landeros* and another Ninth Circuit case, *Hylton*, but believes that the two cases are reconcilable. As already noted, in *Hylton*, the Ninth Circuit held that running a criminal history is part of the stop's mission because it is a "negligibly burdensome precaution necessary to complete the stop safely." 30 F.4th at 848 (cleaned up). Critically, however, *Hylton* only dealt with running a driver's criminal records, not a passenger's. 30 F.4th 842.

The Court does not interpret *Hylton* to mean that police can always run the criminal histories of every passenger without prolonging the stop, as the government argues. *See* ECF No. 80 at 2-4. First, as just explained, such an interpretation would be inconsistent with *Landeros* in cases in which officers prolong a stop to demand a passenger's identity. In other words, the Court cannot hold that officers may *always* lawfully run the criminal histories of passengers, because there are situations in which officers may not obtain a passenger's identity without unlawfully prolonging the stop. Second, while running a *driver's* criminal history is a "negligibly

burdensome precaution" (*Hylton*, 30 F.4th at 848), running a *passenger's* (or passengers') is not necessarily negligibly burdensome. During a traffic stop, officers retrieve the driver's identification and run certain checks, including "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. The additional time that it takes to run the driver's criminal history, given that officers already have the driver's identification and may run a check for outstanding warrants, is likely relatively short. The same is not necessarily true for passengers, as officers do not necessarily have their identifications and are not already running checks on them related to the traffic infraction. Additionally, there may be several passengers in a vehicle, adding significant time to the stop to run their criminal histories. Accordingly, while *Hylton* provides that running a criminal history check is a negligibly burdensome safety precaution that is part of the mission of the stop, this Court does not believe that the Ninth Circuit's holding applies to passengers.

Here, running Hoover's criminal records was not part of the mission of the stop. Hoover was not driving, and the car was pulled over for an expired registration. Accordingly, Hoover's criminal history had no bearing on the safe operation of the car. *See Rodriguez*, 575 U.S. at 355 (permitted checks "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.").

While the government argues that officers ran Hoover's records to determine if he was a licensed driver (ECF No. 62 at 7; ECF No. 80 at 5), the Court does not find it credible that officers asked for Hoover's license to see if he could legally drive. This is so because Emry signaled to Adkins to obtain Hoover's identification *before* Emry obtained any documents from Hernandez and discovered that she was not a licensed driver. Government's Ex. 2 at 0:52-1:26; ECF No. 72 at 15. Additionally, officers never asked Hernandez whether she would let Hoover drive her car or asked Hoover whether he would be willing to drive the car. ECF No. 72 at 49-50, 98-99. Moreover, on officers' bodycam footage there is no discussion of whether Hoover may or may not be a licensed driver. *See* Government's Ex. 2; ECF No. 72 at 98. There is only discussion of his criminal records. Government's Ex. 2 at 3:30-5:38. Accordingly, the Court does not find it

1    credible that officers obtained his identification to see if he could legally drive or that officers

2    reviewed his records to make this determination.

3         Running Hoover's criminal records was also not necessary for officer safety. Hernandez

4    was stopped for having a suspended registration; no other traffic violations or suspicious

5    behaviors were observed. ECF No. 72 at 11, 36-37, 38, 88. When officers approached Hernandez

6    and Hoover (before running Hoover's criminal records), nothing occurred to raise any officer

7    safety concerns. ECF No. 72 at 40-42, 44-45, 93-94. Rather, based on the evidence, the Court

8    finds that running Hoover's criminal history was a safety precaution taken to facilitate a detour

9    into an investigation outside the mission of the stop (which is what occurred when officers asked

10   to search the car for *drugs* and guns). Such safety precautions are not part of the mission of the

11   stop. *See Rodriguez*, 575 U.S. at 356 ("On-scene investigation into other crimes, however, detours

12   from [the] mission. So too do safety precautions taken in order to facilitate such detours.")

13   (cleaned up). Accordingly, the Court finds that running Hoover's criminal records was outside the

14   mission of the stop, even considering officer safety.

15        Second, running Hoover's criminal records added time to the stop, approximately two

16   minutes and eight seconds. Government's Ex. 2 at 3:30-5:38.

17        Third, the Court finds that officers did not have independent reasonable suspicion to run

18   Hoover's criminal records, nor does the government argue this.

19        Accordingly, officers unlawfully prolonged the stop when they ran Hoover's criminal

20   records.

21                          **c.    Seeking Consent to Search the Car and Searching It**

22        Having already determined that the stop was impermissibly prolonged when (1) officers

23   asked Hernandez about her probation and (2) ran Hoover's criminal records, the Court need not

24   reach whether officers requesting consent to search the car and searching it (specifically for

25   narcotics) also prolonged the stop. For purposes of this decision, what matters is that the consent

26   was obtained during an unlawfully prolonged stop, as discussed below.

27

28

1
2
3
4
5
6
7
8
9
10
11

### d.    The Consent to Search the Car was Tainted

Under the Fourth Amendment, "evidence obtained subsequent to an illegal investigation is tainted by the illegality and thus inadmissible, notwithstanding the suspect's consent, unless subsequent events have purged the taint." *United States v. Chavez-Valenzuela*, 268 F.3d 719, 727 (9th Cir. 2001), *amended,* 279 F.3d 1062 (9th Cir. 2002) (overruled on other grounds). In determining whether the taint has been purged, courts ask "whether, granting establishment of the primary illegality, the evidence . . . has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* (internal quotations omitted). To make this determination, courts consider: (1) the time between the illegality and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of police misconduct. *Id.* at 727-28.

Here, the Court concludes that Hernandez's consent to search her car was the fruit of an unlawful detention.

First, the time between the illegality (asking Hernandez about her probation and running Hoover's criminal history) and seeking Hernandez's consent to search the car was minimal. The time between Emry asking Hernandez about her probation and Emry seeking consent to search the car is only approximately five and a half minutes.[24] *See* Government's Ex. 2 at 04:43:12 (Emry begins asking Hernandez about her probation); Government's Ex. 4 at 0:4:48:34 (Emry obtains consent to search the car). The time between officers reviewing Hoover's criminal history and seeking consent to search the car is even shorter; officers sought consent to search the car immediately after reviewing Hoover's criminal records and having a brief discussion. *See* Government's Ex. 2 at 04:45:02-04:47:08 (Emry reviews Hoover's criminal records); Government's Ex. at 0:4:48:34 (Emry is obtaining Hernandez's consent to search the car).

Second, there were no intervening circumstances that purged the taint.

___

[24] Because officers turned off their bodycams to have a private discussion before seeking consent to search the car, the Court cites to the timestamps on the videos in the upper right corner to show the time elapsed between two bodycam videos, Government's Exs. 2 and 4.

Third, the Court finds that police were engaging in "safety precautions" to facilitate detours into other investigations (i.e., whether Hernandez was in compliance with her probation and whether there was anything they could investigate based on Hoover's criminal history). And this is what occurred when officers used Hoover's criminal history as a reason to search the car for guns *and drugs*, which had nothing to do with ensuring officer safety.

Accordingly, Hernandez's consent to search her car was the fruit of an unlawful detention and cannot validate officers' search. *See Chavez-Valenzuela*, 268 F.3d at 727-28 (holding consent to search car during traffic stop invalid in factually similar case); *United States v. Carillo Rea*, 393 F. Supp. 3d 1025, 1034 (D. Mont. 2019) ("[T]he Court cannot conclude the consent purged the taint of the illegally extended stop. It's questionable whether in the context of a traffic stop an unconstitutional seizure can ever be adequately purged without a significant intervening circumstance.").

Having determined that the stop was unlawfully prolonged and that Hernandez's consent was the fruit of an unlawful detention, the Court now turns to the government's argument that the gun still would have been inevitably discovered.

### B.    Inevitable Discovery

The inevitable discovery doctrine was first recognized by the Supreme Court in *Nix v. Williams,* 467 U.S. 431 (1984). The doctrine provides that if, "'by following routine procedures, the police would inevitably have uncovered the evidence,' then the evidence will not be suppressed despite any constitutional violation." *United States v. Young*, 573 F.3d 711, 721 (9th Cir. 2009); *see also United States v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000) (providing same rule). "[I]nevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment . . . ." *Nix,* 467 U.S. at 444, n.5.

The government must prove that evidence would have been inevitably discovered by a preponderance of the evidence. *Reilly*, 224 F.3d at 994. The government can carry its burden by offering evidence that "'by following routine procedures, the police would inevitably have uncovered the evidence.'" *United States v. Lopez-Soto*, 205 F.3d 1101, 1107 (9th Cir. 2000).

Here, the government has not carried its burden to show that officers would have inevitably discovered the gun.

As the Court already found, under LVMPD policy, cars can be towed when there is no licensed driver present and the car is illegally parked. Government's Ex. 6 at 668, ¶ 12. Under the same policy, when a car is towed, officers are required to conduct an inventory and document all personal property. *Id.*

Critically, however, LVMPD also has a policy that requires other options besides towing to be considered when a driver cannot drive their car away. Specifically, the policy states, "Officers will NOT permit drivers with suspended or revoked privileges to drive away in their vehicle. Alternatives such as release to a licensed driver or other appropriate action *will be considered before towing a vehicle*." Defense Ex. C at 342 (emphasis added). As the Court already explained above in detail, there is a lack of proof that officers considered alternatives such as release to a licensed driver or other appropriate action. Accordingly, the Court cannot find that officers complied with this policy. As such, the government did not show that "by following routine procedures, the police would inevitably have uncovered the evidence." *See Lopez-Soto*, 205 F.3d at 1107. Instead, it is possible that if officers complied with this policy, a licensed driver may have picked up the car for Hernandez. Had this happened, police would not have towed the car, inventoried it, and found the gun.

The Ninth Circuit came to a similar conclusion in *United States v. Wanless*, 882 F.2d 1459 (9th Cir. 1989). In *Wanless,* officers stopped two cars in Washington for speeding. *Id.* at 1460. During the stop, officers discovered that none of the occupants could legally drive. *Id.* at 1461. Officers decided to tow the cars and began inventory searches. *Id.* Under Washington law, officers were not permitted to conduct an inventory search when a car was towed without first asking the driver for consent to search car. *Id.* at 1463. Officers never asked one of the drivers whether he consented to the search. *Id.* Because police did not comply with the applicable procedures (a "small, but ultimately pivotal, point"), the Ninth Circuit held that the inventory search was unlawful. *Id.* at 1463-64. The court also held that the inevitable discovery doctrine

could not save the evidence from exclusion because, again, police did not follow the applicable procedures. *Id.* at 1467.

The same is true here. For the inevitable discovery doctrine to shield the evidence from exclusion, the government needed to show that officers followed the applicable procedures by considering "[a]lternatives such as release to a licensed driver or other appropriate action" before towing Hernandez's car and that after considering such options, the car was towed. *See* Defense Ex. C at 342. Instead, at best, the evidence suggests that officers typically consider other options but did not do so here. Put another way, the government did not carry its burden to show by a preponderance of the evidence that officers considered alternatives *in this case*. As such, the Court cannot determine what would have happened if officers complied with the policy and considered other options. The car might still have been towed. But it also might not have been. This means that discovering the gun was not inevitable.

**IT IS THEREFORE RECOMMENDED** that Defendant's motion to suppress (ECF No. 54) be GRANTED.

NOTICE

This report and recommendation is submitted to the United States district judge assigned to this case under 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation may file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation. Local Rule IB 3-2(a). Failure to file a timely objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED: July 13, 2022

_____
BRENDA WEKSLER
UNITED STATES MAGISTRATE JUDGE